

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

AB:MPR/CRH/RCH                    *271 Cadman Plaza East*
F. #2018R01833/OCDETF #NYNYE-801     *Brooklyn, New York 11201*

October 16, 2020

By ECF

The Honorable Carol B. Amon
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

            Re:    United States v. Salvador Cienfuegos Zepeda
                   Criminal Docket No. 19-366 (CBA) (E.D.N.Y.)

Dear Judge Amon:

            The government respectfully submits this letter in support of its motion for a permanent order of detention for the defendant Salvador Cienfuegos Zepeda.  The defendant held the position of Secretary of National Defense in Mexico from 2012 to 2018.  The defendant abused that public position to help the H-2 Cartel, an extremely violent Mexican drug trafficking organization, traffic thousands of kilograms of cocaine, heroin, methamphetamine and marijuana into the United States, including New York City.  In exchange for bribe payments, he permitted the H-2 Cartel—a cartel that routinely engaged in wholesale violence, including torture and murder—to operate with impunity in Mexico.

            In connection with his crimes, on August 14, 2019, a grand jury sitting in the Eastern District of New York returned an indictment charging the defendant with drug trafficking and money laundering crimes.  That same day, U.S. Magistrate Judge Vera M. Scanlon issued a warrant for the defendant's arrest.

            Federal agents arrested the defendant yesterday in Los Angeles, CA.  He is scheduled to make his initial appearance on a removal complaint in the Central District of California today, and the government expects that he will be transported to the Eastern District of New York and arraigned on the indictment in the coming weeks.  For the reasons set forth below, at his arraignment in the Eastern District of New York, the Court should enter a permanent order of detention, as no combination of conditions can secure the defendant's appearance at trial.

I.      Procedural and Factual Background

        A.      Overview

        Between 2012 and 2018, the defendant was the Secretary of National Defense for Mexico, responsible for managing the Mexican Army and the Mexican Air Force and reported directly to the Mexican President.  While holding public office in Mexico, the defendant used his official position to assist the H-2 Cartel, a notorious Mexican drug cartel, in exchange for bribes.

        B.      Background on the H-2 Cartel

        The H-2 Cartel is a violent Mexican drug trafficking organization that was previously led by Juan Francisco Patron Sanchez, also known as "H-2," and based in Nayarit and Sinaloa, Mexico.   During the relevant time period,  the H-2 Cartel had numerous distribution cells in the United States, including in Los Angeles, Las Vegas, Ohio, Minnesota, North Carolina and New York, through which it distributed thousands of kilograms of heroin, cocaine, methamphetamine and marijuana and earned millions of dollars in illegal proceeds. In Mexico, the H-2 Cartel trafficked in hundreds of lethal firearms and committed countless acts of horrific violence, including torture and murder, in order to protect against challenges from rival drug trafficking organizations, fight for territory and silence those who would cooperate with law enforcement.   The H-2 Cartel has transported drug shipments to and collected drug proceeds from New York City, including areas in Brooklyn.

        The H-2 Cartel has used corruption of public officials, including bribes to the defendant while he was a high-ranking Mexican official, as a means and method of achieving the goals of its drug trafficking enterprise.   In exchange for bribes of other Mexican government officials, the H-2 Cartel ensured the arrest and torture of rival drug traffickers by Mexican law enforcement officials, the release of members of the H-2 Cartel from prison, and the ability to engage in wholesale drug trafficking, firearms trafficking and violence, including dozens of murders, without interference by Mexican law enforcement officials.

        C.      The Defendant's Criminal Conduct

        Evidence obtained by law enforcement officials, including the interception of thousands of Blackberry Messenger communications, has revealed that, while he was the Secretary of National Defense in Mexico, the defendant, in exchange for bribe payments, assisted the H-2 Cartel in numerous ways, including by: (i) ensuring that military operations were not conducted against the H-2 Cartel; (ii) initiating military operations against its rival drug trafficking organizations; (iii) locating maritime transportation for drug shipments; (iv) acting to expand the territory controlled by the H-2 Cartel to Mazatlán and the rest of Sinaloa; (v) introducing senior leaders of the H-2 Cartel to other corrupt Mexican government officials willing to assist in exchange for bribes; and (vi) warning the H-2 Cartel about the

ongoing U.S. law enforcement investigation into the H-2 Cartel and its use of cooperating witnesses and informants—which ultimately resulted in the murder of a member of the H-2 Cartel that the H-2 Cartel senior leadership incorrectly believed was assisting U.S. law enforcement authorities.

Among the many communications captured during the course of this investigation are numerous direct communications between the defendant and a senior leader of the H-2 Cartel, including communications in which the defendant discussed his historical assistance to another drug trafficking organization, as well as communications in which the defendant is identified by name, title and photograph as the Mexican government official assisting the H-2 Cartel. Due in part to the defendant's corrupt assistance, the H-2 Cartel conducted its criminal activity in Mexico without significant interference from the Mexican military and imported thousands of kilograms of cocaine, heroin, methamphetamine, and marijuana into the United States.

These thousands of intercepted communications amongst the members of the H-2 Cartel are corroborated by numerous drug seizures of hundreds of kilograms of cocaine, heroin and methamphetamine, as well as the seizure of hundreds of thousands of dollars in drug proceeds in the United States. In addition, witnesses have provided a wealth of information to the government about the operations of the H-2 Cartel, its regular employment of violence to further its drug trafficking, its use of bribery to ensure government protection, as well as the assistance of the defendant to the H-2 Cartel and other drug trafficking organizations.

As noted above, on August 14, 2019, a grand jury in the Eastern District of New York returned an indictment charging the defendant with: (i) participating in an international heroin, cocaine, methamphetamine and marijuana distribution conspiracy, in violation of Title 21, United States Code, Sections 963, 960(b)(1)(A), 960(b)(1)(B)(ii), 960(b)(1)(G), 960(b)(1)(H) and 959(d); (ii) participating in a heroin, cocaine, methamphetamine and marijuana importation conspiracy, in violation of Title 21, United States Code, Sections 963, 960(b)(1)(A), 960(b)(1)(B)(ii), 960(b)(1)(G) and 960(b)(1)(H); (iii) participating in a heroin, cocaine, methamphetamine and marijuana distribution conspiracy, in violation of Title 21, United States Code, Sections 846, 841(b)(1)(A)(i), 841(b)(1)(A)(ii)(II), 841(b)(1)(A)(vii) and 841(b)(1)(A)(viii); and (iv) participating in a conspiracy to launder narcotics proceeds, in violation of Title 18, United States Code, Section 1956(h). Federal agents arrested the defendant yesterday in Los Angeles, CA.

II.     The Court Should Enter a Permanent Order of Detention

A.     Legal Standard

Under the Bail Reform Act, 18 U.S.C. § 3142 et seq., in cases where a defendant is charged with "an offense for which a maximum term of imprisonment of ten years or more

3

is prescribed in the Controlled Substances Act," a court must presume, "subject to rebuttal by the person," that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community," if the court finds probable cause to believe that the person committed such offense. 18 U.S.C. § 3142(e)(3)(A). Regardless of whether the presumption applies, such probable cause may be established by an indictment, such that there is no need for an independent judicial probable cause determination. See United States v. Contreras, 776 F.2d 51, 54-55 (2d Cir. 1985).

If a presumption of detention is applicable, the defendant bears the burden of rebutting that presumption by coming forward with evidence "that he does not pose a danger to the community or risk of flight." United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001) (citation omitted). In any event, the government must ultimately persuade the court by a preponderance of the evidence that the defendant is a flight risk. See United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987); United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985). Detention based on danger to the community must "be supported by clear and convincing evidence." 18 U.S.C. § 3142(f).

The Bail Reform Act lists four factors to be considered in the detention analysis whether for risk of flight or dangerousness: (1) the nature and circumstances of the offense charged; (2) the history and characteristics of the defendant; (3) the seriousness of the danger posed by the defendant's release; and (4) the evidence of the defendant's guilt. See id. § 3142(g). At a detention hearing, the government may proceed by proffer, United States v. Ferranti, 66 F.3d 540, 541 (2d Cir. 1995); United States v. Martir, 782 F.2d 1141, 1145 (2d Cir. 1986). As the Second Circuit has explained:

> [I]n the pre-trial context, few detention hearings involve live testimony or cross-examination. Most proceed on proffers. See United States v. LaFontaine, 210 F.3d 125, 131 (2d Cir. 2000). This is because bail hearings are 'typically informal affairs, not substitutes for trial or discovery.' United States v. Acevedo-Ramos, 755 F.2d 203, 206 (1st Cir. 1985) (Breyer, J.) (quoted approvingly in LaFontaine, 210 F.3d at 131). Indeed, § 3142(f)(2)(B) expressly states that the Federal Rules of Evidence do not apply at bail hearings; thus, courts often base detention decisions on hearsay evidence. Id.

United States v. Abuhamra, 389 F.3d 309, 320 n. 7 (2d Cir. 2004).

B.    A Presumption of Detention Applies

This case involves offenses for which there is a presumption that no combination of conditions will reasonably assure the defendant's appearance or the safety of the community. See 18 U.S.C. § 3142(e)(3). Specifically, the drug trafficking offenses

4

charged in Counts One through Three, each of which prescribes a mandatory minimum term of imprisonment of ten years, carry the presumption for detention.  See id.  Accordingly, the defendant bears the initial burden of showing that he is not a flight risk.  For the reasons set forth below, he cannot sustain that burden.

> C.    The Defendant Poses a Significant Risk of Flight

The defendant poses a significant risk of flight.  The defendant faces a ten-year mandatory minimum sentence of prison on Counts One through Three of the indictment. Moreover, assuming he falls within a Criminal History Category I, the government's preliminary Guidelines estimate for the charged crimes is life imprisonment.  As noted above, the evidence supporting these serious charges is strong, including thousands of intercepted communications among members of the H-2 Cartel, the defendant and other corrupt officials, testimony from multiple cooperating witnesses regarding the operations of the H-2 Cartel and numerous drug seizures.  Given the significant jail time the defendant faces upon conviction, he has a strong incentive to flee the jurisdiction.  See United States v. Cisneros, 328 F.3d 610, 618 (10th Cir. 2003) (defendant was flight risk because her knowledge of the seriousness of charges against her provided a strong incentive to abscond to Mexico); Martir, 782 F.2d at 1147 (defendants charged with serious offenses whose maximum combined terms of 105 years' imprisonment created potent incentives to flee); United States v. Dodge, 846 F. Supp. 181, 184-85 (D. Conn. 1994) ("possibility of a severe sentence" heightens risk of flight).

Moreover, the defendant is a citizen and resident of Mexico who was arrested upon his arrival into Los Angeles International Airport.  The defendant only infrequently travels to the United States.  Prior to today, the defendant had not traveled to the United States since March 2019.  The defendant has no apparent significant connection to the United States. Indeed, the defendant has extremely strong and continuing ties to Mexico, where he normally resides.  Given his absence of any connection to the United States and extensive ties to Mexico, the defendant constitutes a significant risk of flight.  See, e.g., United States v. Boustani, 356 F. Supp. 3d 246, 255 (E.D.N.Y. 2019) (citing defendant's "complete lack of ties to the United States, and extensive ties to foreign countries without extradition" as demonstrative of defendant's serious risk of flight).

In addition, the defendant would likely seek to leverage his connections to high-level H-2 Cartel members in Mexico, as well as former high-level corrupt government officials, to assist him in fleeing from U.S. law enforcement and shelter him in Mexico.  See United States v. Bruno, 89 F. Supp. 3d 425, 432 (E.D.N.Y. 2015) (observing, in case involving both serious flight risk and danger to community, that where defendant's "alleged ties to a large criminal syndicate indicate that he has strong connections to people who have the resources to, ability to, and interest in helping him flee the jurisdiction," that favors denying bail).  While the United States and Mexico have an extradition treaty, it will be extremely difficult to apprehend the defendant in Mexico if the H-2 Cartel and powerful former government officials shield him.  Moreover, even if he is captured, extradition proceedings in

Mexico may take years to complete, if the defendant contests his extradition.  There is therefore a significant risk that the defendant's flight to Mexico would ensure he does not face justice in an American courtroom.  Cf. Boustani, 356 F. Supp. 3d at 255 (citing defendant's "extensive ties to foreign countries without extradition" as demonstrating defendant's "serious risk of flight"); United States v. Epstein, 155 F. Supp. 2d 323, 326 (E.D. Pa. 2001) (finding defendant's extensive ties to Brazil, a country with which United States has no extradition treaty, to be "crucial factor" in denying bail).

Although the defendant does not have a criminal history, the defendant's personal history and characteristics demand detention and demonstrate that he is a significant flight risk.  As the instant investigation has revealed, the defendant prioritized his personal greed over his sworn duties as a public servant, and he assured the continued success and safety of one of Mexico's most violent drug trafficking organizations.  As the defendant's criminal conduct makes clear, he has no respect for public authority or the rule of law, and he has previously endangered the safety of U.S. law enforcement officials and their witnesses by disclosing the existence and status of the criminal investigation into the H-2 Cartel to its senior leadership.  Thus, there is no reason to believe that the defendant would obey the Court's orders or conditions of release if the Court granted bail.

Notably, the Honorable Brian M. Cogan recently denied a bond application in similar circumstances.  In United States v. Garcia Luna, et al., 19-CR-576 (S-1) (BMC) (E.D.N.Y.), Judge Cogan denied the bond application of Genaro Garcia Luna, the former Mexican Secretary of Public Security, who had been charged with drug trafficking offenses related to his corrupt assistance to the Sinaloa Cartel during his time in public office.  See Dkt. No. 38.  In denying the application, Judge Cogan noted that the defendant faced a "significant period of time [of imprisonment] if there is a conviction" and lacked "community ties" after spending "his entire life in Mexico."  Id.  Judge Cogan further stated: "[B]ased on his former position as a high-ranking Mexican government official, [the] defendant has access to various sophisticated and influential actors who may be able to render him assistance should he return to Mexico.  Therefore, there is a real possibility that he may evade capture and prosecution in the event he flees the United States."  Id.  Similar factors enumerated by Judge Cogan in Garcia Luna are present here and further warrant the defendant's detention.

Finally, any proposed use of home detention and/or electronic monitoring in lieu of detention is insufficient here in light of the defendant's risk of flight described above.  Such a proposal "at best elaborately replicate[s] a detention facility without the confidence of security such a facility instills."  United States v. Orena, 986 F.2d 628, 632 (2d Cir. 1993); see United States v. Zarrab, No. 15 CR 867 (RMB), 2016 WL 3681423, at *10 (S.D.N.Y. June 16, 2016).  Here, such an arrangement is wholly inadequate to ensure that this defendant will not flee from justice.

III.   Conclusion

        For the foregoing reasons, the government respectfully requests that the Court issue a permanent order of detention.

Respectfully submitted,

SETH D. DᴜCHARME
Acting United States Attorney

By:   ____/s/_____
Michael P. Robotti
Ryan C. Harris
Craig R. Heeren
Assistant U.S. Attorneys
(718) 254-7000